444                               449 Mass. 444 (2007)

Suffolk Construction Co., Inc. *v.* Division of Capital Asset Management.

## SUFFOLK CONSTRUCTION CO., INC. *vs.* DIVISION OF CAPITAL ASSET MANAGEMENT.

Suffolk. March 6, 2007. - July 13, 2007.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & CORDY, JJ.

*Public Records. Municipal Corporations,* Public record. *Privileged Communication. Evidence,* Privileged communication. *Attorney at Law,* Attorney-client relationship. *Statute,* Construction.

Confidential communications between public officers and employees and governmental entities and their legal counsel, undertaken for the purpose of obtaining legal advice or assistance, are protected under the normal rules of the attorney-client privilege [448-452], and the provisions of the public records law, G. L. c. 66, § 10, and G. L. c. 4, § 7, Twenty-sixth, did not extinguish the protection provided by the attorney-client privilege to records made or kept by public officers or employees and governmental entities subject to that law [452-461].

CIVIL ACTIONS commenced in the Superior Court Department on August 19 and 23, 2005.

The cases were consolidated and a question of law was reported by *Mitchell J. Sikora, Jr.,* J.

The Supreme Judicial Court granted an application for direct appellate review.

*Christopher W. Morog (Joel Lewin & Jeremy Blackowicz* with him) for the plaintiff.

*Daniel J. Hammond,* Assistant Attorney General, for the defendant.

The following submitted briefs for amici curiae:

*Christopher J. Petrini, Glenna J. Sheveland, & Thomas J. Urbelis* for City Solicitors and Town Counsel Association.

*Roscoe Trimmier, Jr., Richard J. Lettieri, Michael J. Howe, David S. Mackey, & Shelly L. Taylor* for Massachusetts Port Authority.

*Edward V. Colbert, III,* for Boston Bar Association.

MARSHALL, C.J. The issue in this case is whether, by enacting the public records law, G. L. c. 66, § 10, and G. L. c. 4, § 7,

Twenty-sixth, the Legislature intended to extinguish the protection provided by the attorney-client privilege to public officers or employees and governmental entities subject to that law. The case arises in conjunction with a dispute between Suffolk Construction Co., Inc. (Suffolk), as general contractor, and the defendant, the division of capital asset management and maintenance (DCAM),[1] over payment of construction costs for the renovation of the public building in Boston now known as the John Adams Courthouse (the project). In the course of the dispute, Suffolk made two public records requests to DCAM for documents concerning the project. In response, DCAM produced approximately one-half million pages of documents, as well as an index of documents withheld from disclosure on grounds of, among other reasons, attorney-client privilege. Suffolk maintained that the production of the privileged information was required under our holding in *General Elec. Co.* v. *Department of Envtl. Protection*, 429 Mass. 798 (1999) (*General Elec. Co.*), in which we declined to find an implied exemption in the public records law for information otherwise protected by the attorney work-product doctrine.

In accordance with the public records law, Suffolk filed a complaint in the Superior Court for declaratory and injunctive relief. See G. L. c. 66, § 10 (*b*). The Superior Court judge denied Suffolk's motion for preliminary injunctive relief and simultaneously reported the following question of law to the Appeals Court: "Do the provisions of the public records law, comprised of G. L. c. 66, § 10[,] and G. L. c. 4, § 7 (26), preclude the protection of the attorney-client privilege from records made or received by any officer or employee of any agency of the Commonwealth?" See G. L. c. 231, § 111; Mass. R. Civ. P. 64 (*a*), as amended, 423 Mass. 1403 (1996). We granted the parties' joint application for direct appellate review.[2]

We answer the reported question in the negative. As we

---

[1] The full name of the defendant entity is the division of capital asset management and maintenance (DCAM). DCAM is an agency within the executive office of administration and finance charged with, among other things, maintaining public capital facilities in the Commonwealth. See G. L. c. 7, § 39A (*f*).

[2] We acknowledge amicus briefs submitted by the Massachusetts Port Authority, the Boston Bar Association, and the City Solicitors and Town Counsel Association.

discuss more fully below, the attorney-client privilege is a fundamental component of the administration of justice. Today, its social utility is virtually unchallenged. Nothing in the language or history of the public records law, or in our prior decisions, leads us to conclude that the Legislature intended the public records law to abrogate the privilege for those subject to the statute. The result Suffolk seeks — a global withdrawal of the attorney-client privilege from all documents and records of officials and agencies subject to the public records law — is not required by the plain terms of the public records law. It would also severely inhibit the ability of government officials to obtain quality legal advice essential to the faithful discharge of their duties, place public entities at an unfair disadvantage vis-à-vis private parties with whom they transact business and for whom the attorney-client privilege is all but inviolable, and impede the public's strong interest in the fair and effective administration of justice.[3] Answering the reported question in the negative, we remand the case to the Superior Court for further proceedings consistent with this opinion.

1. *Background.* The factual record is uncontested. In 2001, DCAM designated Suffolk and a joint venture partner[4] as general contractor for the historic restoration of the so-called "old" Suffolk County Court House, now the John Adams Court House, in Pemberton Square, Boston. In the course of its work, and in connection with changes in construction plans and schedules, Suffolk submitted to DCAM a number of "proposed change orders," including omnibus proposed change order 704. If accepted in full, the proposed change orders would have substantially increased DCAM's payments to Suffolk under the contract.[5] In April, 2004, after evaluating proposed change order 704 with its architects and consultants, DCAM denied payment thereunder.

---

[3]This case arose in the context of a civil dispute, and the parties' briefs confined themselves to that arena. However, it became clear from a colloquy at oral argument that Suffolk would have us construe the public records law as abrogating the attorney-client privilege in the criminal context as well.

[4]The joint venture partner is not a party to this case.

[5]Suffolk contended that the proposed change orders were occasioned by inadequacies in the construction documentation it received from DCAM that resulted in extensive and unanticipated additional work.

On October 7, 2004, Suffolk served two comprehensive public records law requests on DCAM. See G. L. c. 66, § 10 (*a*). Among other things, Suffolk sought to "inspect and review all documents of every kind" related to the project, including "all documents between and among [the executive office for administration and finance] and/or DCAM, their counsel, agents, employees, consultants and/or counsel for other entities regarding this request." Suffolk claimed that such documents could not "be withheld in light of the holding" in *General Elec. Co.* Over the next eleven months, in what the judge termed "an ongoing incremental process," DCAM produced a large volume of material to Suffolk. Concurrently with the release of documents, DCAM created what the judge termed "an evolving privilege log" that, in its most relevant iteration, identified 189 documents withheld from public inspection on the ground of attorney-client privilege.

In August, 2005, Suffolk filed a verified complaint against DCAM for declaratory and injunctive relief, seeking to compel inspection and review of the withheld documents. See G. L. c. 66, § 10 (*b*). Simultaneously, Suffolk moved for a preliminary injunction seeking essentially the same relief.[6] DCAM opposed the motion. Four days after Suffolk filed its complaint and motion for preliminary injunction in the instant action, it filed a complaint against DCAM in the Superior Court for breach of contract, in which it sought damages allegedly resulting from uncompensated extra work on the project.

The Superior Court judge hearing the public records law complaint issued four simultaneous rulings. The first denied Suffolk's motion for preliminary injunction on the grounds that, among other things, "the merits remain arguable, . . . the balance of irreparable harm in light of the merits favors the defendant . . . , [and a] preliminary injunction would alter, rather than preserve, the status quo." See *Packaging Indus. Group, Inc.* v. *Cheney*, 380 Mass. 609, 616-622 (1980). The second ruling ordered DCAM, among other things, to enlarge its privilege index to include additional information relating to its claim of

---

[6]Among other things, Suffolk alleged that access to the documents was critical to its defense of multiple subcontractors' claims for compensation.

attorney-client privilege.[7] A third order consolidated the two actions Suffolk filed against DCAM. Finally, recognizing that a ruling on Suffolk's preliminary injunction plea would dispose of the public records case, and that the issue raised by Suffolk had not previously been decided by our appellate courts, the judge reported the above question.

In its brief to this court, Suffolk questions whether, under our common law, we recognize an attorney-client privilege in the public sphere. We turn first to this threshold question and, concluding that such a privilege does exist, then consider whether it is abrogated by the public records law.

2. *Discussion.* a. *The attorney-client privilege.*[8] The general features of the attorney-client privilege are well known: the attorney-client privilege shields from the view of third parties all confidential communications between a client and its attorney undertaken for the purpose of obtaining legal advice. See; e.g., *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 481 (1990), quoting *Hunt* v. *Blackburn*, 128 U.S. 464, 470 (1888) ("seal of secrecy" on confidential communications between client and counsel); *Foster* v. *Hall*, 12 Pick. 89, 93 (1831) ("the general rule [is] that [where] matters [are] communicated by a client to his attorney, in professional confidence, the attorney shall not be at any time afterwards called upon or permitted to disclose in testimony"). Dating at least from the

[7]The order also required DCAM to produce to Suffolk seventy-five documents originally withheld pursuant to the "deliberative process" exemption, see G. L. c. 4, § 7, Twenty-sixth (*d*), but since acknowledged by DCAM to be outside of the coverage of subsection (*d*) because the relevant policy-making process had concluded and the formal litigation between the parties had commenced. See *id.* On appeal, DCAM asserts that although it has produced the documents previously withheld pursuant to subsection (*d*), it does not agree as a legal matter that it was obligated to do so. DCAM's assertion is tangential to the question before us, and we express no opinion on it.

[8]Suffolk argues that we need not reach the question whether the attorney-client privilege applies to government entities because this case concerns only the disclosure of documents under the public records law and "does not raise any question about compelling an attorney (or client) to testify about privileged communications under the Massachusetts Rules of Civil Procedure." However, the reported question specifically asks us to decide whether the attorney-client privilege applies in the context of the public records law. Moreover, although the rules of civil procedure govern privileged materials in the context of civil litigation, the attorney-client privilege is applicable as well to transactional legal matters and criminal legal proceedings.

age of Shakespeare, "[t]he attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981).

One obvious role served by the attorney-client privilege is to enable clients to make full disclosure to legal counsel of all relevant facts, no matter how embarrassing or damaging these facts might be, so that counsel may render fully informed legal advice. In a society that covets the rule of law, this is an essential function. See, e.g., *Hatton* v. *Robinson*, 14 Pick. 416, 422 (1834) (attorney-client privilege exists to enable attorney "successfully to perform the duties of his office").

The individual benefits of the attorney-client privilege mirror its more global functions. By "encourag[ing] full and frank communication between attorneys and their clients," the attorney-client privilege "promote[s] broader public interests in the observance of law and administration of justice." *Upjohn Co.* v. *United States*, *supra*. Paradoxically, this is so even though the attorney-client privilege may impede access to relevant facts. The attorney-client privilege " 'creates an inherent tension with society's need for full and complete disclosure . . . .' But that is the price that society must pay for the availability of justice to every citizen, which is the value that the privilege is designed to secure." *Matter of a John Doe Grand Jury Investigation*, *supra* at 482, quoting *In re Grand Jury Investigation*, 723 F.2d 447, 451 (6th Cir. 1983), cert. denied, 467 U.S. 1246 (1984).

Suffolk does not attack the privilege itself but rather maintains that, in this Commonwealth, the application of the privilege in the public realm is "uncertain." It is not. Our prior decisions have presumed the existence of an attorney-client privilege for public officials and government entities. See, e.g., *District Attorney for the Plymouth Dist.* v. *Selectmen of Middleborough*, 395 Mass. 629, 632 n.4 (1985) (assuming without deciding that "public clients have an attorney-client privilege"); *Vigoda* v. *Barton*, 348 Mass. 478, 485-486 (1965) (letters defendant public official wrote to personal attorney and to assistant attorney general, copies of which were in plaintiff's personnel file, properly excluded from evidence at trial "as confidential communications between lawyer and client"). See also *Judge Ro-*

*tenberg Educ. Ctr., Inc.* v. *Commissioner of the Dep't of Mental Retardation (No. 1)*, 424 Mass. 430, 457 n.26 (1977) (attorney-client privilege not found where public officials failed to establish that those present at meeting provided attorney with information needed to advise department).

We now state explicitly that confidential communications between public officers and employees and governmental entities and their legal counsel undertaken for the purpose of obtaining legal advice or assistance are protected under the normal rules of the attorney-client privilege.[9] See generally 1 P.R. Rice, Attorney-Client Privilege in the United States § 4.28, at 124-125 (2d ed. 1999) (noting general application of attorney-client privilege to governmental entities). The necessity of the privilege for governmental entities and officials flows directly from the realities of modern government. Public employees must routinely seek advice from counsel on how to meet their obligations to the public. It is in the public's interest that they be able to do so in circumstances that encourage complete candor, without inhibitions arising from the fear that what they communicate will be disclosed to the world. If counsel, despite all diligence, are unable to gather all of the relevant facts, they will less likely serve the public interest in good government by preventing needless litigation or ensuring government officials' compliance with the law. In short, counsel will be less likely to perform adequately the functions of a lawyer. See, e.g., Mass. R. Prof. C. 1.1, 426 Mass. 1308 (1998) (competence); Mass. R. Prof. C. 1.6, 426 Mass. 1322 (1998) (confidentiality of information).

Because the attorney-client privilege serves the same salutary purposes in the public as in the private realm, "it is now well established that communications between government agencies

_____

[9]Like the private claimant, the public claimant of the privilege bears the burden of proof, see, e.g., *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. Ltd. (Bermuda)*, 425 Mass. 419, 421 (1997) (claimant's burden of proving existence of the attorney-client privilege "extends not only to a showing of the existence of the attorney-client relationship but to all other elements involved in the determination of the existence of the privilege, including [1] the communications were received from a client during the course of the client's search for legal advice from the attorney in his or her capacity as such; [2] the communications were made in confidence; and [3] the privilege as to these communications has not been waived").

and agency counsel are protected by the privilege as long as they are made confidentially and for the purpose of obtaining legal advice for the agency." E.S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 127 (4th ed. 2001). See generally Restatement (Third) of the Law Governing Lawyers § 74 (2000) (recognizing an attorney-client privilege for a government client); *id.* at comment b (§ 74 "states the generally prevailing rule that governmental agencies and employees enjoy the same [attorney-client] privilege as nongovernmental counterparts")[10]; 1 P.R. Rice, Attorney-Client Privilege in the United States § 4:28 ("When government agencies consult with legal counsel for the purpose of obtaining legal advice or assistance . . . the attorney-client privilege protects its communications to those attorneys"). See also *Ross* v. *Memphis*, 423 F.3d 596, 601 (6th Cir. 2005) (existing case law "generally assumes the existence of a governmental attorney-client privilege in civil suits between government agencies and private litigants") (citation omitted).[11] These authorities lend substantial weight to our con-

---

[10]Restatement (Third) of the Law Governing Lawyers § 74 comment b also notes: "The objectives of the attorney-client privilege . . . , including the special objectives relevant to organizational clients . . . , apply in general to governmental clients. The [attorney-client] privilege aids government entities and employees in obtaining legal advice founded on a complete and accurate factual picture. Communications from such persons should be correspondingly privileged."

[11]See *In re the County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007), and cases cited ("In civil suits between private litigants and government agencies, the attorney-client privilege protects most confidential communications between government counsel and their clients that are made for the purpose of obtaining or providing legal assistance"); *Ross* v. *Memphis*, 423 F.3d 596, 602 (6th Cir. 2005) (application of privilege promotes "honest and complete" communications between public officials and counsel) (citations omitted); *New York City Managerial Employee Ass'n* v. *Dinkins*, 807 F. Supp. 955, 958 (S.D. N.Y. 1992) (attorney-client privilege protects written communication from city's counsel to city officials and agencies); *Alliance Constr. Solutions, Inc.* v. *Department of Corrections*, 54 P.3d 861, 869-871 (Colo. 2002) (relationship between legal counsel for Department of Corrections [DOC] and project manager for DOC's independent contractor privileged regarding DOC's alleged wrongful termination of construction contract); *Lipton Realty, Inc.* v. *Saint Louis Hous. Auth.*, 705 S.W.2d 565, 570 (Mo. Ct. App. 1986) (letter from housing authority's counsel to executive director of housing authority concerning property inspection at which attorney was present privileged); *State ex rel. Leslie* v. *Ohio Hous. Fin. Agency*, 105 Ohio St. 3d 261, 267

452                                     449 Mass. 444 (2007)

Suffolk Construction Co., Inc. *v.* Division of Capital Asset Management.

clusion that government officials and entities may avail themselves of the protections of the attorney-client privilege.[12]

We turn now to the central issue in this case: whether the public records law extinguishes the attorney-client privilege for government entities and officials subject to that law.

b. *Public records law.* The public records law opens records made or kept by a broad array of governmental entities[13] to

(2005) (privilege protects release of public records; allowing privilege would not lead to undesirable result, as "an attorney does not become any less of an attorney by virtue of state agency employment"); *Port of Seattle* v. *Rio*, 16 Wash. App. 718, 724 (1977) ("We recognize that public agencies are entitled to effective legal representation . . . . The protection of the confidentiality of the attorney-client relationship is needed to preserve the negotiating power of a public agency condemnor at the bargaining table"); *Peters* v. *County Comm'n of Wood County*, 205 W. Va. 481, 488-489 (1999), and cases cited (common-law attorney-client privilege exists for government clients and is not abrogated by open meetings law).

[12]There is no merit in Suffolk's claim that Proposed Mass. R. Evid. 502 (d) (6) and Mass. R. Prof. C. 1.13 comment 6, as appearing in 426 Mass. 1357 (1998), counsel hesitation about the application of the attorney-client privilege to public clients. Proposed Mass. R. Evid. 502 (d) (6) would maintain the attorney-client privilege for public clients only when a court determines that disclosure would "seriously impair the ability of the public officer or agency to process the claim or conduct a pending investigation, litigation, or proceeding in the public interest." Proposed Mass. R. Evid. 502 (d) (6). The rule is identical to the Uniform Rule of Evidence 502(d)(6). Cf. Proposed Fed. R. Evid. 503(a)(1), as appearing at 56 F.R.D. 183, 235 (1972) (defining "client" for purposes of the attorney-client privilege to include governmental entities and public employees). The Proposed Massachusetts Rules of Evidence have not been adopted. Most States that have adopted Uniform Rule of Evidence 502(d)(6) have rejected its proposed limitation on the attorney-client privilege for public employees and governmental entities. See Restatement (Third) of the Law Governing Lawyers § 74 comment b.

Similarly, comment 6 to Mass. R. Prof. C. 1.13, which governs lawyers' responsibilities to organizational clients, merely restates what we have held in other contexts, namely that where a government agency is the client, the Legislature may prescribe different laws and regulations concerning client confidentiality. See, e.g., *General Elec. Co.* v. *Department of Envtl. Protection*, 429 Mass. 798, 802-803 (1999) (*General Elec. Co.*) (public records law reflects Legislature's intent to abrogate attorney work-product protections for public records that do not otherwise fall under one of the specified statutory exemptions).

[13]The requirement to disclose public records is directed to "any officer or employee of any agency, executive office, department, board, commission, bureau, division or authority of the commonwealth, or of any political subdivision thereof, or of any authority established by the general court to serve a public purpose . . . ." G. L. c. 4, § 7, Twenty-sixth. The supervisor of public

public view.[14] See *Worcester Telegram & Gazette Corp.* v. *Chief of Police of Worcester*, 436 Mass. 378, 382-383 (2002) ("The primary purpose of [the public records law] is to give the public broad access to governmental records"); *Globe Newspaper Co.* v. *Boston Retirement Bd.*, 388 Mass. 427, 436 (1983) ("the dominant purpose of the [public records] law is to afford the public broad access to governmental records"). The statute expresses the Legislature's considered judgment that "[t]he public has an interest in knowing whether public servants are carrying out their duties in an efficient and law-abiding manner," *Attorney Gen.* v. *Collector of Lynn*, 377 Mass. 151, 158 (1979), and that "[g]reater access to information about the actions of public officers and institutions is increasingly . . . an essential ingredient of public confidence in government," *New Bedford Standard Times Publ. Co.*, v. *Clerk of the Third Dist. Ct. of Bristol*, 377 Mass. 404, 417 (1979) (Abrams, J., concurring). Modeled after the Federal Freedom of Information Act (FOIA), 5 U.S.C. §§ 552 et seq. (1996), see *General Elec. Co., supra* at 803, the statute obligates certain government entities to produce all "public records"[15] for inspection, examination, and copying in response to a proper public records request made by any "person." See *Bougas* v. *Chief of Police of Lexington*, 371 Mass. 59, 64 (1976), quoting

---

[14] records (supervisor), the official charged by the statute to promulgate regulations implementing the public records law, see G. L. c. 66, § 1, employs the omnibus term "government entity" to express the range of agencies covered by the statute. See 950 Code Mass. Regs. § 32.03 (2003). A "[g]overnmental [e]ntity" is "any authority established by the General Court to serve a public purpose, any department, office, commission, committee, council, board, division, bureau, or other agency within the Executive Branch of the Commonwealth, or within a political subdivision of the Commonwealth. It shall not include the legislature and the judiciary." *Id.*

[14] Although Massachusetts has had a public records law since 1851, the earlier laws were limited and "disappointingly vague." A.J. Cella, Administrative Law and Practice § 1161, at 488 (1986). See generally *Hastings & Sons Publ. Co.* v. *Treasurer of Lynn*, 374 Mass. 812, 815-816 (1978) (recounting history of public records laws in Massachusetts).

[15] The public records law defines "public records" as "all books, papers, maps, photographs, recorded tapes, financial statements, statistical tabulations, or other documentary materials or data, regardless of physical form or characteristics, made or received by" any public officer or employee or government agency covered by the statute, and not falling within the statute's enumerated exemptions. G. L. c. 4, § 7, Twenty-sixth. See 950 Code Mass. Regs. § 32.03 (defining "public records").

G. L. c. 66, § 10 (*a*) (public records available to " 'any person' whether intimately involved with the subject matter of the records he seeks or merely motivated by idle curiosity").

Not every record or document kept or made by the governmental agency is a "public record." The statute specifies fifteen categories of materials or information that fall outside the definition of a "public record," either permanently or for a specified duration. See G. L. c. 4, § 7, Twenty-sixth (*a*)-(*p*). See generally *Cape Cod Times* v. *Sheriff of Barnstable County*, 443 Mass. 587, 591-592 & n.14 (2005) (summarizing statutory exemptions). If a dispute over a withheld document is brought to court, the statute establishes a clear "presumption that the record sought is public" and places the burden on the record's custodian to "prove with specificity the exemption which applies" to withheld documents. G. L. c. 66, § 10 (*c*).

Nowhere in the public records law is the term "attorney-client privilege" found. In parsing the legal meaning of this statutory silence, we begin with the proposition that a statute is construed to fulfil the Legislature's intent, as found most obviously in the words of the law itself, interpreted according to their ordinary and approved usage. See, e.g., *Milford* v. *Boyd*, 434 Mass. 754, 757 (2001). In construing the Legislature's intent, we may also enlist the aid of other reliable guideposts, such as the statute's "progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part." *EMC Corp.* v. *Commissioner of Revenue*, 433 Mass. 568, 570 (2001) (citations omitted). We consider the statute in light of the common law, *Commonwealth* v. *Welosky*, 276 Mass. 398, 401 (1931), cert. denied, 284 U.S. 684 (1932), and we do not construe a statute "as effecting a material change in or a repeal of the common law unless the intent to do so is clearly expressed." *Riley* v. *Davison Constr. Co.*, 381 Mass. 432, 438 (1980), quoting *Pineo* v. *White*, 320 Mass. 487, 491 (1946). See *Kerins* v. *Lima*, 425 Mass. 108, 110 (1997), quoting *Commercial Wharf E. Condominium Ass'n* v. *Waterfront Parking Corp.*, 407 Mass. 123, 129 (1990), *S.C.*, 412 Mass. 309 (1992) (court "will not presume that the Legislature intended . . . a radical change in the common law without a clear expression of such intent"). We do not overlay the words

of a statute with a convention of statutory construction that "would frustrate the general beneficial purposes of the legislation." *Harborview Residents' Comm., Inc.* v. *Quincy Hous. Auth.*, 368 Mass. 425, 432 (1975).

Suffolk claims that our holding in *General Elec. Co.* requires us to read the public records law as abrogating the attorney-client privilege for government officials and entities within the statute's purview with regard to written communications. We do not agree. In *General Elec. Co.*, a company contesting the proposed designation of its property as a "Superfund" site pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601 et seq. (1994), sought public records law disclosure of documents held by the Department of Environmental Protection (department). The department claimed that the documents were protected by the common-law attorney work-product doctrine.[16] *General Elec. Co., supra* at 799. We concluded, in relevant part, that the statute and its history expressed the Legislature's intent to abrogate the broad attorney work-product privilege, and instead to provide to attorney work product the narrower, time-limited protection afforded under G. L. c. 4, § 7, Twenty-sixth (*d*), the so-called "deliberative process" exemption.[17] *Id.* at 802-804.

*General Elec. Co.* provides no guidance for our analysis of the question at hand. First, there is no merit in Suffolk's premise that, for purposes of construing the public records law, the attorney-client privilege and the work-product doctrine are "virtually indistinguishable." The two doctrines are readily differentiated. As one leading authority has noted:                .

> "The protection given both attorney-client communications and 'work product' arise from a common assumption

---

[16]The work-product doctrine, as stated in Mass. R. Civ. P. 26 (b) (3), 365 Mass. 772 (1974), limits the discovery of "documents and tangible things otherwise discoverable . . . and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including his attorney . . .)."

[17]General Laws c. 4, § 7, Twenty-sixth (*d*), provides a public records law exemption for "inter-agency or intra-agency memoranda or letters relating to policy positions being developed by the agency; but this subclause shall not apply to reasonably completed factual studies or reports on which the development of such policy positions has been or may be based."

— that an attorney cannot provide full and adequate representation unless certain matters are kept beyond the knowledge of adversaries. The foci of the two doctrines are different, however. With the attorney-client privilege, the principal focus is on encouraging the client to communicate freely with the attorney; with work-product, it is on encouraging careful and thorough preparation by the attorney. As a result, there are differences in the scope of the protection. For example, the privilege extends only to client communications, while work product encompasses much that has its source outside client communications. At the same time, the privilege extends to client-attorney communications whenever any sort of legal services are being provided, but the work-product protection is limited to preparations for litigation."

E.S. Epstein, The Attorney-Client Privilege and the Work-Product Doctrine 477 (4th ed. 2001). The attorney-client privilege has deep roots in the common law and is firmly established as a critical component of the rule of law in our democratic society. See *Upjohn Co.* v. *United States*, 449 U.S. 383, 389 (1981); *Roberts* v. *Palmdale*, 5 Cal. 4th 363, 380 (1993) (attorney-client privilege "is no mere peripheral evidentiary rule, but is held vital to the effective administration of justice"); *Foster* v. *Hall*, 12 Pick. 89, 93 (1831). The work-product doctrine, in contrast, is a "tool of judicial administration, borne out of concerns over fairness and convenience and designed to safeguard the adversarial system, but not having an intrinsic value in itself outside the litigation arena." *Pete Rinaldi's Fast Foods, Inc.* v. *Great Am. Ins. Cos.*, 123 F.R.D. 198, 201 (M.D.N.C. 1988). See *Admiral Ins. Co.* v. *United States Dist. Court for the Dist. of Ariz.*, 881 F.2d 1486, 1494 (9th Cir. 1989) (work-product doctrine not a privilege but a "qualified immunity"). See also Mass. R. Civ. P. 26 (b) (3), as appearing in 365 Mass. 772 (1974) (offering limited protection to attorney work product). The distinctly different social value assigned to the two doctrines is reflected in the fact that the attorney-client privilege, which belongs to the client, is with rare exceptions inviolable, surviving even the client's death. See *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 484 (1990) ("ordinarily the client's and the public's interests are best served

by a rule of confidentiality that applies both before and after the death of the client"). Cf. *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 115 (1997) (discussing crime-fraud exception to attorney-client privilege). Attorney work product, an immunity for the attorney, on the other hand, is discoverable on a showing of need. See *Hickman* v. *Taylor*, 329 U.S. 495, 511-512 (1947) (discussing circumstances in which production of attorney work product may be compelled); Mass. R. Civ. P. 26 (b) (3).

Second, the deliberative process privilege is a "sub-species of work-product privilege that covers documents reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *In re the County of Erie*, 473 F.3d 413, 417 n.3 (2d Cir. 2007), quoting *National Council of La Raza* v. *Department of Justice*, 411 F.3d 350, 356 (2d Cir. 2005). In *General Elec. Co.*, we declined to construe the public record law as implying a broad exemption for attorney work product where the Legislature affirmatively expressed its intent to provide a more limited immunity from production. *General Elec. Co.*, *supra* at 802. There is no "deliberative process" subset of the attorney-client privilege. That the Legislature expressly intended to truncate the protections of the attorney work-product doctrine under the public records law by providing an exemption from disclosure to a distinct subset of attorney work product, then, does not speak to the Legislature's intentions with regard to the attorney-client privilege.[18] In *General Elec. Co.*, we applied the maxim of statutory construction

---

[18]Nor does Suffolk's appeal to legislative history lend weight to its argument. There is little merit in Suffolk's contention that the Legislature's affirmative rejection of proposed exemption (*k*) from the public records law as enacted in 1973 reflects an intent to abrogate the attorney-client privilege for government officials. Proposed exemption (*k*) would have added to the public records law a "civil litigation" exemption. See *General Elec. Co.*, *supra* at 802-803. Congress included such an exemption in the Federal Freedom of Information Act (FOIA). *Id.* at 803-804. The proposed civil litigation exemption is at once narrower (because it is focused only on litigation) and broader (because it encompasses material other than confidential attorney-client communications) than the attorney-client privilege and is therefore not comparable to the privilege for purposes of this analysis. Nor can the rejection of proposed exemption (*k*) be seen, as Suffolk asserts, as a conscious decision to deviate from Congress's embrace of the attorney-client privilege in FOIA, 5 U.S.C.

that the expression of one thing in a statute implies the exclusion of similar things. See *General Elec. Co., supra* at 802; *Harborview Residents' Community, Inc.* v. *Quincy Hous. Auth.,* 368 Mass. 425, 432 (1975). Here, in contrast, we confront the Legislature's statutory silence on a matter of common law of fundamental and longstanding importance to the administration of justice. As the judge in the Superior Court aptly noted, the withdrawal of the attorney-client privilege from any party or client is "extraordinary." We do not employ the conventions of statutory construction in a mechanistic way that upends the common law and fundamentally makes no sense. See *Sun Oil Co.* v. *Director of the Div. on the Necessaries of Life,* 340 Mass. 235, 238 (1960) (statutes to be construed, wherever possible, "in accordance with sound judgment and common sense"). Cf. *Commissioner of Corps. & Taxation* v. *Dalton,* 304 Mass. 147, 150 (1939) ("A matter may be within the letter of a statute and not come within its spirit, if the matter is beyond the mischief intended to be reached or if to include it would require a radical change in established public policy or in the existing law and the act does not manifest any intent that such a change.

§ 552(b)(5) (1996). Rather, as DCAM correctly notes, at the time Congress enacted 5 U.S.C. § 552(b)(5), FOIA's cognate of proposed exemption (*k*), it was unclear whether the provision had any applicability to the attorney-client privilege. That question was not resolved until two years after the enactment of the public records law, in *NLRB* v. *Sears, Roebuck & Co.,* 421 U.S. 132, 154 (1975).

We are equally unmoved by Suffolk's contention that legislative events following our decision in *General Elec. Co., supra,* bear on our analysis. The Legislature several times has considered but has not enacted proposed amendments to the public records law that would specifically exempt attorney-client materials from the public records laws. See, e.g., 2007 Sen. Doc. No. 832 (amending exemption provision, G. L. c. 4, § 7, Twenty-sixth, by inserting a new exemption for "attorney work product and attorney-client privileged material"); 2007 House Doc. No. 1624 (same); 2005 Sen. Doc. No. 927 (same); 2005 House Doc. No. 758 (same). Contrary to Suffolk's contention, "[l]egislative inaction gives no instructive signal concerning the construction of a statute enacted by a prior Legislature . . . ." *Klingel* v. *Reill,* 446 Mass. 80, 86 (2006), quoting *Polaroid Corp.* v. *Commissioner of Revenue,* 393 Mass. 490, 496 (1984). We are especially reluctant to attribute meaning to suggested amendments that, apparently, never were put to the vote before the entire General Court. See *Franklin* v. *Albert,* 381 Mass. 611, 615-616 (1980) ("The practicalities of the legislative process furnish many reasons for the lack of success of a measure other than legislative dislike for the principle involved in the legislation") (citation omitted).

should be effected").[19] The holding of *General Elec. Co.* does not lead to the conclusion that, in enacting the public records law, the Legislature mandated that public officials perform their duties without access to legal advice protected by the attorney-client privilege.[20]

We reject Suffolk's argument that construing the attorney-

---

[19]See *County of Bristol* v. *Secretary of the Commonwealth*, 324 Mass. 403, 407 (1949) (court will not apply the convention of statutory construction that mention of one thing in statute precludes inclusion of that not mentioned unless "in the natural association of ideas the contrast between a specific subject matter which is expressed and one which is not mentioned leads to an inference that the latter was not intended to be included within the sweep of the statute"); *Hiss* v. *Bartlett*, 3 Gray 468, 473 (1855) ("The maxim, expressio unius exclusio est alterius, does not apply except where the two cases are alike").

[20]Nor does Suffolk, as it asserts, find support for the result it seeks in two cases preceding *General Elec. Co.* In *Babets* v. *Secretary of Human Servs.*, 403 Mass. 230 (1988), we declined the request of the defendant public officials to declare certain documents protected from discovery on the grounds of a so-called "executive privilege," which had not previously been recognized in the Commonwealth and for which the defendants failed to justify a need. See *id.* at 233-234, 237-239. Here, in contrast, we are concerned with the claimed abrogation of a common-law privilege, a privilege well-established.

Similarly, in *District Attorney for the Plymouth Dist.* v. *Selectmen of Middleborough*, 395 Mass. 629 (1985), we rejected the contention of the defendant selectmen that they could shut down an ongoing open meeting in order to hold a closed session with the town attorney for reasons the selectmen acknowledged to fall outside the express statutory exemptions in the open meetings law for closed executive sessions. See G. L. c. 39, §§ 23A-23C. That the Legislature intended certain discussions between public officials and their counsel to take place in the open does not imply that no communication between the public counsel and the public client can ever be confidential. See, e.g., *Dunn* v. *Alabama State Univ. Bd. of Trustees*, 628 So. 2d 519, 529-530 (Ala. 1993) (attorney's ability to fulfil ethical duties under attorney-client privilege unmarred by Alabama sunshine law); *Roberts* v. *Palmdale*, 5 Cal. 4th 363, 381 (1993) (neither California's public records nor open meeting law requires public disclosure of written legal opinion from city attorney and distributed to members of city council concerning matter pending before council; "city council needs freedom to confer with its lawyers confidentially in order to obtain adequate advice, just as does a private citizen who seeks legal counsel, even though the scope of confidential meetings is limited by this state's public meeting requirements"); *Oklahoma Ass'n of Mun. Attorneys* v. *State*, 577 P.2d 1310, 1315 (Okla. 1978) (finding no legislative intent to abrogate the attorney-client privilege in the open meetings law). But see *Neu* v. *Miami Herald Publ. Co.*, 462 So. 2d 821, 823, 825 (Fla. 1985) (sunshine law applied to "meetings between a City Council and the City Attorney held for the purpose of discussing the settlement of pending litigation to which the

client privilege for public officials to exist separately and apart from the public records law contravenes the Legislature's strong policy favoring open government, or creates incentives for public officials to misuse the attorney-client privilege. Addressing first the operational concerns, we emphasize that public officials seeking the protection of the attorney-client privilege are required to produce detailed indices to support their claims of privilege, as DCAM was ordered by the judge to do in this case. Cf. *Worcester Tel. & Gazette Corp.* v. *Chief of Police of Worcester*, 436 Mass. 378, 384 (2002) (where applicability of public records law exemption is questionable, review may "be accomplished through the use of an itemized and indexed document log in which the custodian sets forth detailed justifications for its claims of exemption"). Attorneys and judges are then free, as always, to test the sufficiency of the claim of privilege. Suffolk has offered nothing other than speculation to support its claim that our holding would open the door to actions of bad faith, or that courts and opposing counsel lack the tools to probe claims of attorney-client privilege.

Nor do we have cause to presume that governmental entities and their counsel will have difficulty winnowing unprivileged from privileged information in response to a public records request. In an era in which public entities are regularly subject to litigation and discovery by private parties, responding to document requests and differentiating among discoverable and undiscoverable material are routine parts of doing business.

"Governments must not only follow the laws, but are under additional constitutional and ethical obligations to their citizens. The [attorney-client] privilege helps insure that conversations between [government] officials and attorneys will be honest and complete. In so doing, it encourages and facilitates the fulfillment of those obligations. . . . 'Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest.' " *Ross* v. *Memphis*, 423 F.3d 596, 602 (6th Cir. 2005), quoting *In re*

---

city is a party"; "there are no confidential communications to protect" because meetings must be held in public).

*Grand Jury Investigation,* 399 F.3d 527, 534 (2d Cir. 2005). If the Legislature intended to divest government officials and entities subject to the public records law of a privilege as basic and important as the attorney-client privilege, it would have made that intention unmistakably clear.

3. *Conclusion.* For the reasons stated above, we answer the reported question in the negative and remand the case to the . Superior Court for further proceedings consistent with our decision.[21]

*So ordered.*

---

[21]In light of our holding today, we do not address the question, raised sua sponte by the Superior Court judge, whether adopting Suffolk's proposed construction of the public records law would, in the judge's words, "intrude so deeply into the work of the executive branch of the Commonwealth as to violate the doctrine of separation of powers embodied in Article 30" of the Declaration of Rights of the Massachusetts Constitution.