SUPERIOR COURT 
 
 DR. DAVID M. SABATINI Plaintiff vs. DR. KRISTIN A. KNOUSE, & others[1] Defendants

 
 Docket:
 22-1449-BLS1
 
 
 Dates:
 February 17, 2023
 
 
 Present:
 Peter B. Krupp Justice of the Superior Court
 
 
 County:
 SUFFOLK, ss.
 

 
 Keywords:
 MEMORANDUM AND ORDER ON MOTION FOR IMPOUNDMENT OF CONFIDENTIAL INVESTIGATION REPORT
 
 

             Dr. David M. Sabatini (“Sabatini”) brings claims for defamation and tortious interference with employment and other advantageous relationships against Dr. Kristin A. Knouse (“Knouse”), the Whitehead Institute for Biomedical Research (“the Whitehead”), and its director, Dr. Ruth Lehmann (“Lehmann”).2 The case follows a 2021 investigation of Sabatini and his laboratory at the Whitehead by an outside law firm, Hinkley, Allen & Snyder, LLP (“HAS”).
            The HAS report to the Whitehead dated August 13, 2021 (“the HAS Report”) allegedly led to Sabatini losing his laboratory at the Whitehead, his tenured position at the Massachusetts Institute of Technology (“MIT”), his position with the Howard Hughes Medical Institute (“HHMI”), and a variety of other professional affiliations.
            The case is before me on the Whitehead Defendants’ motion to impound the HAS Report, which the Whitehead Defendants submitted in support of their motion to dismiss under
 
-------------------------------------
 
            [1]Whitehead Institute for Biomedical Research and Dr. Ruth Lehmann.
 
[2]The Whitehead and Lehmann are together referred to herein as “the Whitehead Defendants.”
 
                                                            -1-
 
the Massachusetts anti-SLAPP statute, G.L. c. 231, § 59H. The Whitehead Defendants’ motion asserts (at page 2), without citation to authority, that HAS conducted a “privileged and confidential workplace investigation,” and (at page 3) urges impoundment of the HAS Report “to protect the identities of those who participated in the [workplace] investigation” conducted by HAS “and the private and sensitive information they shared.” For the following reasons, the motion to impound is denied.
DISCUSSION
            Under Rule 7(a) of the Massachusetts Uniform Rules of Impoundment Procedure, a court “may enter an order of impoundment for good cause shown.” To assess “good cause,” the court is directed to “consider all relevant factors, including, but not limited to, (i) the nature of the parties and the controversy, (ii) the type of information and the privacy interests involved, (iii) the extent of community interest, (iv) constitutional rights, and (v) the reason(s) for the request.” Unif. R. Impound. P. 7(b). Accord New England Internet Café, LLC v. Clerk of the Superior Court for Criminal Business in Suffolk County, 462 Mass. 76, 83 (2012). Massachusetts overwhelmingly favors a right of access to case records. Id. at 82-83. Therefore, “impoundment is always the exception to the rule, and the power to deny public access to judicial records is to be ‘strictly construed in favor of the general principle of publicity.’” Republican Co. v. Appeals Court, 442 Mass. 218, 223 (2004), quoting Commonwealth v. Blondin, 324 Mass. 564, 571 (1949), cert. denied, 339 U.S. 984 (1950).
            The Whitehead Defendants do not contend that the HAS Report is covered by any statutory or common law privilege. They do not cite any statute or other authority under which the HAS Report could be construed as privileged, nor have I found any such citation in the HAS Report itself. Although they describe the HAS Report as the fruits of the Whitehead’s workplace
 
                                                            -2-
 
investigation, they do not allege that the investigatory privilege, which applies to government or criminal investigations, applies in this context. See District Attorney for Norfolk Dist. v. Flatley, 419 Mass. 507, 512-513 (1995); Bougas v. Chief of Police of Lexington, 371 Mass. 59, 62 (1976).
            While the HAS Report’s cover page states it is “ATTORNEY-CLIENT PRIVILEGED CONFIDENTIAL,” it is unclear if the attorney-client privilege ever covered all or some of the HAS Report. The HAS Report largely collects reports by various witnesses, no differently than if the Whitehead had conducted the investigation in-house or had hired a private investigation firm to do the investigation. Assuming, however, that the report was, at least initially, covered by the attorney-client privilege (HAS was hired by the Whitehead, synthesized information it gathered, and reported to the Whitehead), that privilege was forfeited or waived when the Whitehead purposefully disseminated the HAS Report beyond its institution. See Comm’r of Revenue v. Comcast Corp., 453 Mass. 293, 306 (2009) (“Disclosing attorney-client communications to a third party . . . generally undermines the privilege.”). See also, e.g., Brauner v. Valley, 101 Mass. App. Ct. 61, 72 (2022) (attorney-client privilege waived when shared with person not protected under common interest doctrine).[3]
            Further, although the Massachusetts Commission Against Discrimination has promulgated guidelines for certain workplace investigations, even its guidelines, upon which the Whitehead Defendants rely, suggests only that an investigation should be conducted in a way to
 
-------------------------------------
 
[3]The Whitehead also does not and could not contend that its disclosures of the HAS Report were all covered by the “derivative attorney-client privilege,” which is “sharply limited in scope” and applies only when the disclosure was “nearly indispensable” or served “some specialized purpose” in furthering the attorney-client privilege. DaRosa v. New Bedford, 471 Mass. 446, 463 (2015) (internal citations omitted).
 
                                                            -3-
 
maintain confidentiality “to the extent practicable under the circumstances.” Strict confidentiality cannot be assured.
            Here, the Whitehead has already taken steps to protect the identity of the individuals who spoke to the HAS investigators. In the anonymized form of the HAS Report that is before me, the names of the individuals who were interviewed by HAS have been replaced with anonymous role descriptors (e.g. “Postdoc 6,” “Whitehead Faculty 2,” or “MIT Graduate Student 19”). The Whitehead does not explain how the anonymized form of the HAS Report would not adequately protect the identities of the individuals who spoke to the HAS investigators.
            More importantly in this situation, to protect confidentiality the party in possession of the information must take steps to make sure the information remains confidential. As the Supreme Judicial Court has held, “whether the information sought to be protected is . . . confidential . . . depends on the conduct of the parties and the nature of the information.” Jet Spray Cooler, Inc. v. Crampton, 361 Mass. 835, 840 (1972) (in trade secrets context, one factor bearing on whether information should be protected as confidential by court is “the extent of measures taken by the employer to guard the secrecy of the information”).
            The Whitehead did not adequately guard the confidentiality of the HAS Report. The Whitehead disclosed the HAS Report shortly after it was issued, and, other than stamping most of the pages as “Privileged & Confidential,” it disclosed the report without limitation on its further disclosure. The Whitehead disclosed the HAS Report in this manner to, among others, members of the Whitehead’s executive committee (4-5 people); to MIT’s counsel, provost, and dean of science; to HHMI; to a couple of MIT faculty member-liaisons who took over Sabatini’s laboratory; and to two attorneys representing Sabatini.
 
                                                            -4-
 
            It could have been reasonably expected that many of these individuals would share the report with others to perform their own investigation or due diligence, to seek legal advice, to communicate with clients or witnesses, or to decide what to do with, and to assess the reliability of, the information in the HAS Report. Nonetheless, the Whitehead did not disclose the HAS Report to these people under a nondisclosure agreement, or a judicial order barring further dissemination of the report. (Indeed, the only nondisclosure agreement that counsel has brought to my attention was one used by Sabatini’s prior counsel when disclosing a copy of the HAS Report to one of Sabatini’s prospective future employers.) Thus, shortly after the report was issued, any of the people to whom the report was disclosed, including Sabatini, could have disclosed the report more widely.[4]
            I also cannot shut my eyes to the obvious. The HAS Report has been released much more widely. A copy of the HAS Report forms the basis for plaintiff’s detailed complaint in this case, which was originally filed in Middlesex Superior Court in October 2021. The HAS Report was obviously available to journalists and has formed the basis for reporting about the Whitehead’s handling of the investigation and the termination of Sabatini’s employment, including as early as May 2022. See, e.g., Arsenal, M. & Irons, M.E., “Fate and the fallen star,” The Boston Globe (Jan. 28, 2023), available at https://apps.bostonglobe.com/metro/investigations/spotlight/ 2023/01/fallen-star/fall-of-david-sabatini/ (last viewed Feb. 16, 2023); Weiss, S., “He was a
 
-------------------------------------
 
[4]With respect to the Whitehead’s other disclosures of the HAS Report, including to a broader group at the Whitehead and to Dr. Knouse and her attorneys, the Whitehead provided the HAS Report on a platform that limited it to a read-only format and which prevented anyone accessing the report from downloading, printing, or forwarding a copy. Of course, anyone afforded such access could have allowed another person to log on to the platform to read the HAS Report themselves, or could have taken screen shots or photographs of the report’s text. Again, apparently no nondisclosure agreements were procured in connection with any of these disclosures.
 
                                                            -4-
 
World-Renowned Cancer Researcher. Now He’s Collecting Unemployment.,” The Free Press (May 19, 2022), available at https://www.thefp.com/p/he-was-a-world-renowned-cancer- researcher (last viewed Feb. 16, 2023). And the full anonymized HAS Report has been posted on-line with annotations.[5]
            The recent reporting in The Boston Globe – and the considerable debate about the handling of this situation evidenced in that coverage – underscores the substantial public interest in this case, in the manner in which the HAS investigation was conducted, and in the way the Whitehead treated Dr. Sabatini, Dr. Knouse, and the information disclosed in the HAS Report. Balancing the factors listed in the Uniform Rules of Impoundment Procedure, and particularly in light of the manner and extent to which the HAS Report has already been disseminated and the fact that the HAS Report is already publicly available, the Whitehead has not offered sufficient justification to impound the report at this time.
ORDER
            Defendant Whitehead Institute for Biomedical Research and Dr. Ruth Lehmann’s Motion for Impoundment of Confidential Investigation Report (Docket #54) is DENIED.
 
 
 
-------------------------------------
 
[5]The Whitehead Defendants would like me to conclude that Dr. Sabatini publicly posted the annotated version of the HAS Report online. The record is inadequate for me to draw any such conclusion. Nor can I determine when the annotated report was provided to whoever posted it online.
 
                                                            -6-
 
xxz